IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AARON LITTLE FRENCH, #319-091    *
         Plaintiff
      v.                *   CIVIL ACTION NO. CCB-08-3476

JAMES SMITH              *
GARY HORNBAKER
JOHN ROWLEY             *
J. MICHAEL STOUFFER
RICHARD GRAHAM,       *
         Defendants
                      ***

**MEMORANDUM**

Pending are defendants' motion to dismiss or for summary judgment, plaintiff's self-represented opposition, and defendants' reply. ECF Nos. 21, 34–38, & 49. The case is ripe for dispositive review. Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

**Background**

Plaintiff, a Division of Correction ("DOC") inmate, alleges that from September 15, 2005, to September 1, 2006, he was incarcerated at the Jessup Correctional Institution ("JCI"), formerly known as the Maryland House of Correction-Annex ("MHC-X"). He states that on March 21, 2006, he was assaulted by twelve prison guards. On July 25, 2006, a prison guard at the Maryland House of Correction ("MHC") was killed. JCI was placed on lock down in order to allocate JCI staff to MHC to assist MHC staff in the lock down and shakedown of the MHC prison. In August and September, 2006, while MHC remained on lock down status, the DOC began swapping inmates

from MHC who were assigned to the State Use Industries ("SUI") for inmates housed at JCI who were on lock-down status, thus allowing the SUI to reopen while MHC remained locked down. Plaintiff states that on September 1, 2006, he was transferred from JCI to MHC as part of this inmate swap. Plaintiff states that at the time of his transfer he was housed on disciplinary segregation, was the only inmate transferred from his tier, and was "probably" the only inmate transferred from his housing unit. Compl. 8, ECF No. 1. He believes this transfer was retaliatory because at the time of his transfer he was pursuing, through the prison grievance process, his claim that prison guards had assaulted him.

Plaintiff further alleges that he was confined at MHC from September 1, 2006 until March 16, 2007, when the prison closed. He states that the conditions at MHC were cruel and unusual. Specifically, plaintiff alleges that during his six and one-half month stay at MHC he was not permitted to exercise out of his cell because the prison remained on lock-down status. Plaintiff states that due to the small dimension of his cell he was unable to exercise in his cell. He states that during his incarceration at MHC he suffered from high blood pressure and a "bad flare up of chest pains." *Id.* at 10. He states that he has been advised by physicians to exercise and cut back on starch and sodium. He states that his inability to exercise while housed at MHC adversely affected his health.

Plaintiff states that he was denied adequate warmth and clothing and while housed at MHC his "serviceable clothing dwindled to 1 T-shirt, 3 underwear, 2 shirts, 1 pants, 1 sweatpants, 3 socks (all with holes) [and], 1 thermal underwear top." *Id.* at 11. He states that he never had a coat or hat while at MHC and that from October, 2006 throughout the winter of 2006-07 the temperature in his cell was ten degrees below the outside temperatures. Plaintiff states that the exterior windows at

MHC were chipped and broken. The "cells facing these windows were open air cages, caged off from floor to ceiling with steel bars at the fronts of the cells facing the windows." *Id.* at 12. Plaintiff states that he was issued two blankets at MHC but he had to use one to hang over the face of his cell bars to break the cold wind rushing into his cell. He states that he suffered from several colds, fever and winter illness.

Plaintiff further alleges that inmates were encouraged to throw their food containers and trash onto the tier walkway to be cleaned later. He states that food, trash and sewage congealed in the gutters along the edge of the tier. Plaintiff states that while MHC remained on lockdown inmates were not allowed to clean the tier and the officers responsible for doing so only cleaned the trash off the tier when it became difficult to walk. He states that frequently the trash was simply kicked aside into the tier gutters. Plaintiff claims that rats, mice, spitting cockroaches, flies and "night bugs" ran along the gutters on the outer edge of the tier. *Id.* at 15. He states that he was bitten by a mouse at JCI and had difficulty sleeping at night at MHC because that was the time when the mice and cockroaches would try to enter his cell.

Plaintiff states that at one time inmates who were transferred from JCI to MHC protested by setting a fire outside of their cells. A fire was set in September but the soot, dirt and ashes remained until January due to lack of cleaning.

Plaintiff also claims that the showers were unsanitary. He states that he refused to take a shower during his first few weeks there. He also states that one shower was held open below the prison structure with bricks and steel girders, and that in order to enter the shower he had to walk through water and soap scrum and sludge to a stall that was filthy. He further states that the second tier shower was home to the "mother-of-all-giant-spitting-cockroaches." *Id.* at 17.

3

Plaintiff states that outside inmate workers were brought in to clean MHC but that they did not clean the inmate living areas, rather, they only cleaned the administrative, kitchen and hospital areas.

On March 16, 2007, Plaintiff was transferred from MHC to the North Branch Correctional Institution (NBCI).  Plaintiff states that prior to his transfer to NBCI he was strip searched by correctional officers who adopted hostile martial arts poses.  He was transported by bus to NBCI. He did not receive his lunch meal during his transfer and received a cold cheese and milk dinner that evening.

Plaintiff states that his boots were confiscated and he was provided foam shower shoes.  He states that during orientation he was not permitted any property other than basic necessities.  He states he did not lose any property upon his transfer to NBCI because it had already been lost when he was transferred to MHC.  He claims NBCI's property limitations are much more restrictive than JCI's.

He states that upon his transfer to NBCI he was placed on administrative segregation as NBCI has no general population.  He states that he is not able to accumulate good time credits or hold a prison job while housed there.  Plaintiff further alleges that being housed in a single cell at NBCI isolates him from peer contact greater than he would experience in segregation at JCI.  He states that the commissary and visitations privileges afforded at NBCI are more restrictive than those at JCI.  He also states that he has been denied access to religious programming.

Plaintiff claims that he had not been given a written rationale for his placement on segregation at NBCI.  Additionally, plaintiff asserts that the conditions of administrative segregation

at NBCI are "atypical" as his assignment was tantamount to indefinite placement on solitary confinement and includes the confiscation of property and the revocation of privileges. *Id.* at 24.

He further claims that he is subjected to excessive shackling and that the arrangements of NBCI, including the limited recreation, have adversely affected his physical and mental health. He further states that on December 10, 2007, Warden Rowley ordered that all cell windows be locked in order to save heating expenses. Plaintiff states that the as a result of locking the cell windows, his cell temperature "must have been 90 degrees" by the end of the day which caused him to suffer dizziness. *Id.* at 27–29. It also limited the ability of inmates to contact each other, leading to "sensory deprivation." *Id.* at 28. The locking of the windows caused the air to become dry and stale and when mace was used in another cell it spread throughout the facility. Plaintiff states the he was forced to sleep on the floor of his cell to keep his head near the bottom of the cell door where air enters the cell.

Plaintiff further states that showers were to be offered twice a week but this did not always happen. Plaintiff states that since October, 2007, he has been denied showers in an unwritten policy of retaliating against inmates.

Plaintiff claims that NBCI violates fire safety by covering fire sprinklers with steel caged covers. He also alleges that the covering of the sprinklers creates an easy perch for "suicidal hanging" and that he has witnessed at least one inmate use the sprinkler cover for that purpose.[1] *Id.* at 33.

---

[1] Plaintiff has since abandoned claims regarding frequency of showers at NBCI and fire sprinklers. ECF. No. 38, at 4–5.

Plaintiff states that on April 17, 2008,[2] he was evaluated by medical personnel regarding an illness and allergic reaction to dairy products.  He was diagnosed as lactose intolerant and prescribed a lactose-free diet.  He states that upon his transfer to NBCI in March, 2007, he informed NBCI medical personnel that he was prescribed a lactose free diet but NBCI staff refused to honor the prescription and served plaintiff meals containing dairy products.

Plaintiff states that during his transfer from MHC to NBCI he was subjected to excessive force.  He states that correctional officers were instructed to wear combat or riot fatigues and act aggressively toward the inmates.  Plaintiff was handcuffed and escorted from his cell by MHC staff.  He was turned over to transfer officers in a staging area at MHC being used to strip search and secure inmates in three point restraints.  Plaintiff states that there were officers with dogs, officers in riot fatigues and cameramen.  Clothing was taken from inmates and intelligence officers were conducting inspections of confiscated contraband and taking notes.  Plaintiff states that when he entered the area, his name was taken on a list and he was ordered inspected ahead of several waiting inmates. He states he was taken into a wide hall where groups of "[four] man teams [were] strip searching inmates and looking as if at any moment they would lash out with physical force." Compl. 36.  When plaintiff was paired with a team he observed that two men were assigned to conduct the search, one man was on stand-by with mace and the fourth man was assigned to confiscate plaintiff's clothes, provide him a jumpsuit, and restrain him in three point restraints. Plaintiff was told to face the wall and listen carefully to the search instructions.  He was advised that if he did anything outside of the instructions it would be viewed as an act of aggression and met with force.  Plaintiff was "given agonizingly slow command to strip piece by piece and prompts of

---

[2] It appears plaintiff means 2006.

exactly at what time to move to strip off that piece of clothing." *Id.* at 36–37.  Plaintiff states that the directions were given in such a way to catch him off guard so that he would do something inadvertently contrary to the instructions which would then be viewed as an act of aggression and met with force.  Plaintiff states that he did act out of the instructions by "turn[ing] to look over his shoulder to see the face of the officer talking this bullshit to [him]." *Id.* at 37.  He was then shoved behind his right shoulder by an unknown officer who then adopted a martial arts stance and the officer on plaintiff's left yelled at him and told him to face the wall.  The officers then gripped plaintiff behind the top of the shoulder blade on each side and held plaintiff to the wall.  The search continued.  Plaintiff was instructed to "bend at the waist and spread his butt open." *Id.* at 37–38. Plaintiff refused to do so.  He attempted to "drop and squat," a tactic plaintiff maintains is "a less intrusive measure with arguably the same results," however, three to four officers grabbed plaintiff and forced his buttocks open for inspection. *Id.* at 38.  Plaintiff states that he was grabbed, jerked, held, and pinched by the officers.  Having found nothing, the officers allowed plaintiff to dress and placed him in restraints.

## Standard of Review

**A.       Motion to Dismiss**

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63

(2007).  Once a claim has been stated adequately, it may be supported by showing any set of facts

consistent with the allegations in the complaint.  *Id.* at 563.  The court need not, however, accept

unsupported legal allegations, *see Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir.

1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286

(1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black*

*Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).


**B.      Motion for Summary Judgment**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that "[t]he court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has

clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly supported
> motion for summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact.

 *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should

"view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her

favor without weighing the evidence or assessing the witness' credibility."  *Dennis v. Columbia*

*Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir. 2002).  The court must, however, also abide

8

by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses

from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 323–24 (1986)).


**Analysis**

A.      **Mootness**

Defendants assert that plaintiff's complaint for injunctive relief is now moot in regard to his

complaints of conditions of confinement at MHC because he is no longer housed there.  ECF No. 21.

"[A] case is moot when the issues presented are no longer live or the parties lack a legally

cognizable interest in the outcome."  *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008)

(internal quotation marks omitted) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)).

"'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III

of the Constitution under which the exercise of judicial power depends upon the existence of a case

or controversy.'"  *Id.* (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).  Under 42 U.S.C. §

1983, an actual controversy must exist at all times while the case is pending.  *See Steffel v.*

*Thompson*, 415 U.S. 452, 459 n.10 (1974).  It is possible for events subsequent to the filing of the

complaint to make an injunctive relief request moot.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th

Cir. 1991).  This is so even though such a case presented a justiciable controversy at an earlier point

in time and an intervening event rendered the controversy moot.  *See Calderon v. Moore*, 518 U.S.

149, 150 (1996).  Indeed, "[w]here on the face of the record it appears that the only concrete interest

in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is

not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained . . . ."  *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).  To the extent that plaintiff is seeking injunctive relief, as to his claims arising from his confinement at JCI and MHC the claims were mooted when he was transferred to NBCI.  His claim for damages for the past wrongs alleged, however, is not moot, and will be analyzed below.

## B.      Respondeat Superior: Assault and Strip Search

Plaintiff's complaints against the named defendants former Warden James Smith, former Warden Gary Hornbaker, former Warden John Rowley, former Acting Warden Richard Graham, and Commissioner J. Michael Stouffer, as to the March 21, 2006,[3] assault as well as in regard to the strip

---

[3]A review of institutional records, as well as plaintiff's complaint, reveals that he did not notify MHC-X (now known as JCI) personnel of the alleged assault upon him.  ECF No. 21, Ex. 1, at 2, ¶ 7.  MHC-X personnel became aware of plaintiff's allegation after his request for administrative remedy was forwarded to MHC-X Warden James Smith.  *Id.*; *see also* ECF No. 21, Ex. 2.  In response to plaintiff's Administrative Remedy Policy complaint ("ARP"), Shift Captain Anthony Lewis prepared a memorandum to Captain Edward Wood denying giving any order to have plaintiff removed from his cell and taken to A-Building to be assaulted.  Lewis further denied any knowledge of plaintiff being assaulted and noted that the only use of force authorized on March 21, 2006, was unrelated to plaintiff.  ECF No. 21, Ex 2, at 2.  Plaintiff submitted a sick call slip on March 22, 2006, and was evaluated on March 27, 2006.  He claims he had been assaulted by security staff on March 21, 2006.  Upon examination, medical personnel noted plaintiff had bruises on his right lower flank and upper thigh with minimal tenderness to palpation.  It was further noted that plaintiff had no deformity or pain on palpation.  Warm compresses, Tylenol ES and patient education were provided. No further follow up was indicated.  *Id.* at 7.

Plaintiff appealed the ARP of the alleged assault through the IGO level.  ECF No. 21, Ex. 3, at 3.  On December 3, 2007, plaintiff's grievance was denied and dismissed without merit.  Plaintiff sought judicial review in the Circuit Court for Allegany County.  The Circuit Court reversed the ruling of the ALJ remanding the case for consideration as to whether plaintiff should have had the opportunity to present certain witnesses.  *Id.*  On January 27, 2009, a second hearing was conducted and the ALJ again found in favor of the DOC, stating:

Despite the additional evidence, I continue to doubt the credibility of the Grievant's account.  It is true that the physician's assistant observed bruises to the Grievant's right side, but she also said he was not in apparent distress and had minimal tenderness on palpation.  This contradicts the Grievant's claim about the utter brutality of the alleged beating and the severity and duration of his pain.  Also, the bruising the health care provider described is inconsistent with the Grievant's claim that the officers "stomped and beat" him 80 times everywhere but his face.  Moreover, the physician's assistant did not observe the Grievant's allegedly busted lips or lumps and bumps on his head, nor any bruises on the front of the Grievant's body that would surely have resulted from having been repeatedly banged into the wall.  It is true that the physician's assistant did not examine the Grievant until six days after the

search that occurred prior to his transfer to NBCI are based solely upon the doctrine of *respondeat superior,* which does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).  Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).  Plaintiff has pointed to no action or inaction on the part of the named defendants that resulted in his being assaulted by the twelve unnamed prison

---

alleged assault, but even then I would have expected the Grievant to still display more signs of a brutal beating.
      At the second hearing, the Grievant presented testimony from inmate Matthews Oakes. . . . I do not find Mr. Oakes' testimony about the Grievant's condition credible.  Mr. Oakes' testimony about the injuries to the Grievant's face contradicts the Grievant's testimony that officers beat him everywhere <u>but</u> his face.  Accordingly, I do not find Mr. Oakes credible.

*Id.* at 13–14 (emphasis in original).  The ALJ also rejected plaintiff's claim that Captain Williams escorted him from his cell for the express purpose of allowing other officers to assault him.  *Id.* at 14.

guards, or being assaulted during the strip search, and accordingly, his claims against them shall be dismissed.[4]

## C.     Transfers:

Plaintiff's claims that his transfers from JCI to MHC and later from MHC to Administrative Segregation at NBCI were improper are also subject to dismissal.   It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship.   "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."   *Meachum v. Fano*, 427 U.S. 215, 224 (1976); s*ee also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (requiring an "atypical and significant hardship" as prerequisite to creation of a constitutionally protected liberty interest).   Plaintiff does

---

[4] Defendants indicate plaintiff was strip searched pursuant to Department of Safety and Correctional Services directives which set for the standard procedure for strip searching inmates prior to transfer.   ECF No. 21, Exs. 1 & 9.   The strip searches described also do not rise to the level of an atypical and significant hardship.   Under the Fourth Amendment, a particular search is reasonable if the need for the search outweighs the invasion of personal rights that the search entails.   *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (courts should consider the scope of intrusion, the manner in which the search is conducted, the justification for the search, and the place in which it is conducted).   The *Bell* Court specifically upheld a policy providing for a visual body cavity search of prison inmates finding that prisons are places fraught with serious security dangers in which inmates attempt to secrete contraband by concealing it in body cavities.   *Id.*   Strip searches of convicted persons do not amount to a *per se* violation of privacy rights, as long as the genitals of the persons being searched are not involuntarily exposed to members of the opposite sex.   *See Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981).   Even if the individual officers conducting the searches had been named as defendants, the claim fails.   A defendant is entitled to avail himself of a qualified immunity defense when at the time of the claimed violation the right asserted was not clearly established and a reasonable person in the official's position would not have known that his conduct violated that right.   *See Rish v. Johnson*, 131 F. 3d 1092, 1095 (4th Cir. 1997).   Strip searches are a regular part of legitimate prison security.   Requiring plaintiff to be strip searched as part of the transfer was not outrageous conduct.   *See, e.g., Fillmore v. Page*, 358 F.3d 496, 501, 505–06 (7th Cir. 2004) (discrete and expeditious strip search during transfer not unconstitutional even though guard 'examined each of the usual body locations five times").   Thus, even if the officers who conducted the search were defendants in this action, they would be entitled to summary judgment.

not have a right to be housed in a particular prison or participate in a particular program, and these allegations must be dismissed.

Additionally, plaintiff was not eligible for general population upon his transfer to NBCI. By order of Regional Commissioner Galley all inmates assigned to disciplinary segregation, such as plaintiff, who were transferred to NBCI were placed on administrative segregation. And, defendants allege, after his transfer to NBCI plaintiff received numerous adjustments and was assigned to disciplinary segregation at NBCI. In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U. S. at 484. Following the reasoning of the Supreme Court in *Sandin*, the court finds no liberty violation implicated in the decisions associated with plaintiff's initial placement on administrative segregation at NBCI, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). The court finds there is nothing in the record which shows that the nature of plaintiff's assignment to administrative segregation at NBCI comprised the atypical hardship contemplated by *Sandin* or *Beverati*. Therefore, such assignment does not implicate a liberty interest. Further, as noted above, plaintiff's transfer to NBCI does not in and of itself implicate a liberty interest; he has no entitlement to notice or an opportunity to be heard prior to his transfer because as a prisoner he has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244–45 (1983); *Meachum*, 427 U.S. at 224–25.

To the extent plaintiff claims the transfer to MHC was in retaliation for pursuing his grievance concerning the alleged assault, his claim fails. In order to prevail on a claim of retaliation, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a

constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).  "'[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone.'"  *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).  Plaintiff maintains that the transfer to MHC was due to his having filed a grievance concerning the assault but plaintiff offers nothing in support of his claim other than self-serving conclusory averments.  Additionally, plaintiff states in his own original complaint that prisoners were exchanged between JCI and MHC in order to keep the State Use Industries functioning during the time of lock down.  There is nothing in the record to suggest that defendants acted in the retaliatory manner alleged by plaintiff.  Moreover, as noted above, the ALJ found that the complaints filed by plaintiff against the officers were not credible. Plaintiff has failed to allege specific facts in support of his claim of retaliation.  *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989) (holding a *pro se* complaint for retaliation must include "some minimum level of factual support"); *Ashann-Ra v. Commonwealth of Va.*, 112 F. Supp. 2d 559, 574 (W.D. Va. 2000) (allegation officer placed inmate in segregation for threatening to sue fails to state claim of retaliation for exercise of protected right).

## D.     Conditions of Confinement

Plaintiff alleges that the conditions at MHC during his approximately six-month stay there were cruel and unusual.  Defendants indicate that no recreation records were located from plaintiff's housing at MHC because, despite his having a disciplinary segregation to serve, he was housed on general population and recreation was not recorded for general population inmates.  ECF No. 21, Ex.

1, at 2, ¶ 8; ECF No. 49, at 13–14.[5]  They further indicate that that glass panes were frequently broken by inmates at MHC but were quickly replaced upon notifying MHC personnel of the broken panes.  ECF No. 21, Ex. 1, at 3, ¶ 11.  Each tier at MHC contained an area where trained maintenance personnel could cut glass panes, remove the damaged panes and replace them.  Given the localized and expedited repair process no maintenance records were kept as to repair of the glass.  No maintenance records were kept as to temperatures inside the institution, but efforts were undertaken to winterize the institution by placing plastic in front of the windows to provide additional insulation.  *Id.* at 2–3, ¶ 10.

Additionally, defendants maintain that MHC routinely underwent pest control treatment.  In September of 2006, a pest control contractor inspected MHC and treated necessary areas.  There are no reports of a fire on plaintiff's tier and there is no evidence plaintiff complained of smoke inhalation.  *Id.* at 3, ¶ 12.  Further there is no indication that plaintiff filed or exhausted his administrative remedies regarding his concerns over sanitation at MHC.  *Id.* at 3, ¶ 14; ECF No. 21, Ex. 3, at 3–5, ¶ 3.

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  *Id.*  Routine discomfort is part of prison life.  *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) (citing *Hudson v. McMillan*, 503 U.S. 1, 8–9 (1992)).  "In order to establish the imposition of cruel and unusual punishment, a prisoner must

---

[5] Page numbers cited for exhibits refer to page numbers present on the original exhibits, not to the number of the page in the electronic document located on CM/ECF.

prove two elements—that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; internal alterations and citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 298. "In other words, 'the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" *Brown v. N.C. Dept. of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant

physical or emotional injury resulting from the challenged conditions. *See Odom v. S.C. Dept. of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003).

In the instant case there was no bright line crossed by defendants in placing plaintiff at MHC under lock-down conditions. The conditions described by plaintiff were not so severe that defendants could be charged with "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F. 3d 292, 313 (4th Cir. 2006) (internal quotation marks and citation omitted). The discomforts experienced were restrictive and harsh, but did not impose cruel and unusual punishment on plaintiff. This conclusion is supported by the absence of proof of significant, serious physical or psychological injury resulting from plaintiff's temporary stay at MHC. Plaintiff was diagnosed with hyper-tension prior to his incarceration at MHC. Plaintiff states that denial of recreation caused him to "nearly have a heart attack." ECF No. 36, at 2. Medical records, however, do not reflect any notations from medical personnel that plaintiff suffered an overall worsening of any condition while housed at MHC. ECF No. 21, Ex. 4. To the contrary, documentary evidence demonstrates that plaintiff's acute episode of high blood pressure and a "bad flare up of chest pains," Compl. 10, was occasioned by his non-compliance in taking medication to treat his high blood pressure over a two week period. ECF No. 21, Ex. 4, at 1; ECF No. 49, at 14. Additionally, the court observes that plaintiff did not file any ARPs concerning a fire on the tier or his tier not being sanitized or trash not collected.[6] ECF No. 21, Exs. 1 & 3.

---

[6] Thus, plaintiff's allegations as to these issues are also subject to dismissal for failure to exhaust administrative remedies. The Prison Litigation Reform Act ("PLRA") generally requires a prisoner plaintiff to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516,

Conditions may be punitive without invoking due process protections, however, they "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347.  The general rule is that denial of out-of-cell exercise for an extended period of time violates the Eighth Amendment, absent exceptional circumstances. *Mitchell v. Rice*, 954 F.2d 187, 191–92 (4th Cir. 1992) (holding that deprivation of exercise for periods of seven and eleven months may violate the Eighth Amendment).  To state a claim, the restriction on opportunities to exercise must be harmful to the inmate's health. *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 866 (4th Cir. 1975); *see also Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) (finding no constitutional violation where inmates only had access to indoor day room for exercise, but no showing was made that mental or physical health was threatened).  "[W]hen reviewing Eighth Amendment claims, courts must consider the totality of the circumstances." *Mitchell*, 954 F. 2d at 191 (citing *Clay,* 626 F.2d at 347).  Plaintiff makes no allegation that all opportunity to exercise has been taken from him; rather, he alleges that exercising has been limited due to the size of his cell at MHC and lack of opportunities to exercise outside of his cell at NBCI.  Plaintiff's segregation records from NBCI demonstrate he frequently has been offered recreation which he frequently refuses.  ECF No. 49, Ex. 1, at 2–68.  At other times he has been denied recreation due to his poor conduct toward staff.  Further, there is no evidence that plaintiff suffered actual injury from the alleged denial of recreation at MHC or NBCI.

As to plaintiff's claims regarding air quality, on July 10, 2009, NBCI employee Richard Glenn, wrote a report regarding the testing of the ventilation and noted it was found to exceed

---

532 (2002).  The exhaustion provision plainly extends to plaintiff's conditions of confinement and portions of those claims are subject to dismissal. *See Chase*, 286 F. Supp. 2d at 528.

federal standards.  ECF No. 21, Ex. 7.  Notwithstanding his allegations that he has limited peer interactions and limited fresh air activities as well as problems with the ventilation at NBCI, ECF No. 1, there is no evidence that plaintiff suffered serious or significant physical or emotional injury as a result of his confinement at NBCI.  Defendants are therefore entitled to summary judgment on any Eighth Amendment claim.


E.      Property

Plaintiff states that as a result of each transfer he lost property. Defendants maintain that inmates confined at JCI on disciplinary segregation are issued special clothing-high visibility jumpsuits.  ECF No. 21, Ex. 5, at 1.  Once assigned to disciplinary segregation the inmate's personal clothing and other property are collected, inventoried, and stored in the inmate property storage area. *Id.* at 3.  In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U.S. 527, 542–44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.[7] *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[8]   Even if plaintiff's property were improperly destroyed, such a claim does not rise to a constitutional violation.


F.      Lactose Free Diet

---

[7]Plaintiff may avail himself of remedies under the Maryland's Tort Claims Act and through the Inmate Grievance Office.

[8]Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of

Plaintiff's medical records demonstrated that he submitted a sick call slip on April 10, 2006, complaining of lactose intolerance. He was evaluated by medical personnel on April 17, 2006. ECF No. 21, Ex. 4, at 12–13. It was noted that plaintiff had not complained of lactose intolerance until he was placed on segregation. Nonetheless, he was prescribed a lactose free diet and a consultation with the dietician. The lactose free diet was prescribed from April 17, 2006, to extend to April 17, 2008. *Id.* On January 7, 2007, however, plaintiff was prescribed a cardiovascular diet. On January 19, 2009, he was prescribed a 2400 calorie diet. Neither change to his ordered diet noted any allergies or indicated he was to receive a lactose free diet in conjunction with the newly prescribed diet. A medical report dated June 18, 2009, likewise notes no allergies. *Id.* at 16. Plaintiff has filed no sick call slips or ARPs during his incarceration at NBCI concerning the failure to provide him a lactose free diet.[9] ECF No. 21, Exs. 1, 3, & 4, ECF No. 49, Ex. 2. Plaintiff has provided a progress note dated March 16, 2007 which indicates "lactose free, allergic to milk." He has also provided a sick call slip dated May 17, 2007, wherein he requests a copy of his medical diet form from April 17, 2006. He does not offer any complaints in this slip. ECF No. 47, Ex. 2. Additionally, plaintiff indicates when he consumes lactose he suffers abdominal pains for two days, too short a duration to be provided medical care. ECF No. 37, at 4.

Section 1983 liability on the part of a supervisor requires a showing that: (1) the supervisory defendant failed promptly to provide an inmate with needed medical care, (2) the supervisory defendant deliberately interfered with the prison doctors' performance, or (3) the supervisory defendant tacitly authorized or was indifferent to the prison physicians' constitutional violations.

---

lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing plaintiff's due process claim.

[9] Thus, plaintiff's allegations regarding failure to provide him a lactose free diet are also subject to dismissal for

*Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) ("[S]upervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict."). In his complaint, plaintiff makes no specific allegations against the named defendants; rather, it appears that plaintiff seeks to hold the named defendants responsible for the alleged denial of a medically prescribed diet solely because defendants are administrators within the Division of Corrections and the alleged violation happened while plaintiff was under their authority. This is the very essence of the doctrine of respondeat superior, which has no place in 1983 litigation. Defendants are entitled to summary judgment in their favor.

### G.      Violation of Division of Correction Directive Claim

Plaintiff maintains that defendants failed to follow their written directives regarding out of cell activity and in other respects. To the extent that written directive were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[10]

---

failure to exhaust administrative remedies. *See Chase*, 286 F. Supp. 2d at 528.

[10]    Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation "does not constitute a violation of due process, if constitutional minima are nevertheless met." *Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

**Conclusion**

In light of the above analysis, defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be granted as to all claims.   A separate Order follows.

Date: _____March 9, 2012_____                    _____/s/_____
                                                                          Catherine C. Blake
                                                                          United States District Judge